We can call the next case. 17-0753, People V. Charles E. Thornton Back to back, huh? Yeah. I just wanted to make it easier for your scheduling. I know. I appreciate that. Yeah, it doesn't happen all the time. Okay, call the case. She did. You already did? Okay, thanks. I'm just having too much fun with Liz Hine here. We know who she is. She's already been through the ringer. Assistant State's Attorney Caitlin Costa, C-A-I-T-L-I-N, Costa, C-O-S-T-A. Okay, 15 minutes aside, save some time for rebuttal. If we unduly harass you with questions, which is sometimes our want, we might give you a little more time. We shall see. Thank you. May it please the Court, Counsel. My name is Maggie Hine, and I represent the defendant in this case, Mr. Charles Thornton. After a jury trial, Mr. Thornton was convicted of one count of home invasion and five counts of aggravated criminal sexual assault against two victims, D, P, and S, F. Prior to trial, he moved to quash his arrest and suppress evidence due to a Fourth Amendment violation, and that issue has been preserved for appeal. We're now seeking to suppress a consent buccal swab search, in-custody line-ups, and a statement to police. And the first issue this Court has to determine is whether the police can handcuff someone and put them in a squad car to run a name check. Here, Officer Jarvis and his partner received an OAMC call that someone in a green and white outfit on a port was wanted for two sexual assaults. What was the source of that information? It was an OAMC. What did they get? A 911 call? So it was a 911 call. There's a difference, isn't there? Between a 911 call and an OAMC call? And an informant. So the cases do go back and forth, and an informant can be less reliable, so you need to know whether they're getting things. So here we have Officer Jarvis. He gets this OAMC call. Someone in a green and white outfit on a particular porch is wanted for two counts of sexual assault. There are no details on how the caller knew the culprit that they were identifying. The name wasn't given of the caller or of the person they were identifying. And the only fact that was given was that they were wanted by the police. No information on how the caller knew they were wanted by police. The officers went to the area, drove to the area, and they saw Mr. Thornton in the described clothing nearby. So they approached and they asked his name, which he gave. Jarvis then handcuffs the defendant while saying, you're not under arrest, and put him in the back of his car, where his partner stayed with him while Officer Jarvis ran his name. The state doesn't contest that this was a Fourth Amendment stop, but instead the question is whether or not this was a handcuffing requiring probable cause or whether it was a Terry stop requiring reasonable suspicion. Now generally the cases say that handcuffing is a sure sign that you've got an arrest. Absent some sort of circumstance that would make the officers think handcuffing is particularly necessary. So the examples are if you've heard about a home invasion or something like one of the cases cited by the state, Ross. It was a home invasion that had just happened where the defendant had been choking someone and the officer who approached the defendant was alone and on a dark corner. So when the officers are outnumbered, when the defendant is wanted for something particularly violent, when the defendant, they suspect that he's going to be armed, when the defendant looks like he's going to flee or is trying to flee, then if you stop and handcuff him while you do your investigative stop, that's enough. But none of those things are true in this case. Here the defendant was outnumbered. He was entirely cooperative. There was no sign or report in the call that he was in any way armed. This is just like People v. Wells, which came out of this court in 2010, where you had two police officers at 2 a.m. responding to a domestic disturbance call. They found the defendant. He was cooperative and he was not reportedly armed and dangerous. So this court found that handcuffing him turned the encounter into an arrest. Under the circumstances, this court should find the same in this case. This was an arrest where Mr. Thornton was entirely cooperative, was not fleeing, and there was no sign that he was armed or dangerous. Well, the OEMC call said, though, that he was wanted for a violent offense. Was wanted for sexual assaults. Aggravated sexual assault. In the OEMC call? Someone wanted for two aggravated sexual assaults on a porch at 1000 West 61st Street with the description of the clothes. Does it really matter, aggravated sexual assault? It doesn't, because as we'll talk about next. No, I mean, it just does not matter in terms of they're both violent offenses. Well, I think it does not matter, because it's not something where two armed police officers approaching someone on foot alone shouldn't automatically believe that that person is armed and dangerous. I think handcuffing still raises the level. In fact, in the Wells case, the person was accused of threatening to kill his ex-girlfriend, had purportedly just done that within minutes before they actually stopped him because he'd apparently gone back to the. . . The point, I think, that we're trying to make is that there was information that this person may have been involved in a violent offense. And I guess I'm questioning whether simply saying someone's wanted for sexual assaults is enough for police officers to believe they're armed and dangerous such that they can handcuff them. And I would say it's not, because I would say the domestic violence call. . . This one has to be aggravated. I think it's the same. In the domestic violence call, they said that the person was reported to have threatened to kill his ex-girlfriend while he was standing out front. So if that doesn't rise to the level of being able to assume when you outnumber the defendant that he's armed and dangerous such that you have to handcuff him, I don't know what would change in this case. But even if this court is inclined to view this as a Terry stop, it should nonetheless find a Fourth Amendment violation based on the fact that the handcuffing was done based on an uncorroborated tip. Terry stops, while they don't require probable cause, do require reasonable suspicion that the culprit has committed or is about to commit a crime. The U.S. and Illinois Supreme Courts have affirmed again and again that anonymous tips, even if they are not from informants necessarily, can only justify stops if the officers have a concrete reason for relying on the tipster's assertion that the person is involved in criminal activity. Identifying a specific person in a specific place does not do that. Anyone could turn their neighbor in for anything by simply saying they're wanted for something. There has to be something reliable suggesting that that person was involved in criminal behavior. This can be done through suggesting insider knowledge of the person, or it can be done through suggesting enough details that the police can corroborate that there was some sort of illegality. So some of the cases have, like, a girlfriend calling and saying that her boyfriend was involved in a robbery, and she was also somewhat involved in it. And that's the U.S. v. Hensley case, where there was reasonable suspicion for an alert to go out. Here, the police didn't know how the caller knew the person in green and white. They didn't know how they knew the person was wanted by police. The police did not and could not do anything to corroborate whether Mr. Thornton was actually wanted by police before they handcuffed him to run the name check. In Arnold, there was a second district case where an officer saw someone and thought that she herself remembered seeing that person on a warrant list, but was not sure if there was actually a warrant outstanding, so she called her dispatcher and asked her to look up the name. Meanwhile, the officer went in, approached the defendant, put handcuffs on, and they stood there while she waited for her dispatcher to get back to her. And the appellate court affirms that the handcuffing turned that stop into an arrest and that simply thinking an officer, thinking that they saw someone on an earlier warrant list, was not an adequate reason to handcuff them, and in fact that was reckless behavior that could be deterred through the use of the exclusionary rule. Now, the state suggests that less corroboration is needed when a crime has been completed rather than ongoing, but none of the cases, Florida v. J.L. and People v. Henderson, though they deal with ongoing crimes, they don't suggest that there's a different standard for past crime versus ongoing crime. They simply say that the police must corroborate that the caller is reliable. This can be providing predictive information of future behavior, but it's not necessary. The caller also might give information demonstrating why they know about criminal activities, and that's what happened in the Hensley case. The informant gave a written statement indicating that she, too, was involved in the very past crime being reported and gave a lot of details about the robbery that she was reporting. In Navarrette, you have an eyewitness reporting reckless driving, and she reported the U.S. Supreme Court recognized that it was a contemporaneous account of reckless driving and it was on a recorded phone system, and it's not clear that she didn't give her name. Here, we don't have any information on whether the caller was a witness, a participant, a neighbor. We don't know why they believe the man in green and white was wanted. Jarvis didn't personally see anything suspicious. Mr. Thornton made no attempt to run. Thus, it was unreasonable to handcuff him and move him to the back of a police car for a name check. Now, the state argues in the alternative, even if this court finds a Fourth Amendment violation, that it should find that the evidence is admissible, that the lineups in the statement are admissible under the attenuation doctrine. Here, after 15 hours of continuous custody, Mr. Thornton consented to a buccal swab. About an hour later, he was put into two lineups, and then a few hours after that, he gave a written statement to police. When you get to attenuation, the burden shifts to the state to show that the evidence they want at trial has not been tainted by the initial Fourth Amendment violation. Attenuation generally considers factors like whether Miranda was given before statements, the temporal proximity between when the evidence was gathered and when the arrest occurred. Although temporal proximity, its usefulness varies depending on the type of evidence and whether the person was held in custody. And then attenuation also considers intervening circumstances and whether there was purposeful or flagrant police misconduct. And the most important factors are the final two, because when determining whether or not to use the exclusionary rule, the courts are most concerned if there is any behavior that could potentially be deterred. Here, the state argues that the lineups were attenuated due to how long they occurred after the initial report and due to the lack of purposeful police conduct to be deterred. Temporal proximity adds little to the attenuation calculus for lineups because the defendant has no choice whether to be in them or not be in them when in custody. And even for statements, when a person is in continuous custody, people of E. Jackson recognize that 15 hours may make you more likely to give a statement. So temporal proximity, when there's continuous custody, gives very little information. More importantly, in this case, there is police conduct which is capable of deterrence. First, you have the intentional handcuffing to do a name check. Again, this is like Keeper v. Arnold where a police officer who thought the defendant had been on a previous warrant list handcuffed to do a name check. And again, there, the second district didn't just find that the handcuffing created arrest but also found that handcuffing to do a name check was a type of reckless conduct when you know you're not doing it on the basis of a warrant, which is capable of deterrence. And then in addition to the fact that you have this handcuffing, which comes when the officer has no corroboration that this person was guilty of a crime or suspected of a crime, you also have the calculated use of the investigative alert system. Here, the investigative alert was issued days before, so there was time to get a warrant. The detective also testified very clearly that he had no intention of getting a warrant because he uses the investigative alert system in lieu of getting a warrant. I'm sure this Court is aware. People v. Bass found that the investigative alert system violated the Illinois Constitution because of the requirement of an affidavit for warrants to arrest. This Court need not view this as a Bass issue to recognize that it's the State's burden to show that an investigative alert is the same type of intervening circumstance as a true warrant. There's no case that has approved of the systematic subversion of the warrant requirement or has allowed the use of it to attenuate evidence from an illegal stop. In Utah v. Strife, the United States Supreme Court Isn't the issue whether or not there's probable cause? It's a separate issue. So our first issue is simply that if the stop was illegal, either because it was a Terry stop when he was handcuffed and didn't have reasonable suspicion, or whether it's an arrest where there was an initially probable cause, then you have to do the attenuation analysis. And whether the investigative alert attenuates the evidence becomes the question. And our argument is that because the investigative alert system is a systematic system, because the investigative alert system is a systematic attempt to get around the warrant requirement and make it just rely on police choices rather than a neutral magistrate, there's no reason to use an investigative alert to attenuate evidence when the police could have gotten a warrant in the first place. And then we alternatively argue that in this case there wasn't probable cause because while tentative identifications are often enough for probable cause, here you have a tentative identification which has to be viewed in the context of the fact that the same person that did the tentative ID was told before that or her son before that identification was the person that pinpointed Mr. Thornton despite the fact that he was in no way a witness, and the day before she had made a stronger identification of a different person entirely. Also, at some point, SF's son produced a picture of this defendant. Is that right? I believe the police had a picture. The police testified that she knew what clothes the defendant was wearing before the lineup, and she knew the name and had a picture before the lineup. Right. And SF learned the name. She testified that she learned at one point that she learned the name after the lineup, and then later she said she knew the name before. But the whole lineup thing, it seems to me, they did that on the 19th of July. And when they did that, I couldn't tell from the record whether they had already begun to run the fingerprints. Do you know? I don't know because they do get fingerprints from Mr. Thornton closer to trial, so I don't know when that was done. But he was arrested on the 13th, I think, right? He was arrested on the 19th. On the 14th is when they did the photo lineups that included Mr. Thornton. I'm sorry, he was arrested on the 19th. But there were photo arrays on the 13th and the 14th. Correct. And the witnesses called the police on the 11th. So between the 11th and the time there was a photo array, and then after there were the first photo array, then the son became involved in his own investigation and gave his information to Detective Wiggins, who, in the meantime, did not check to see on his own whether he knew anybody who had a snagged tooth or a chipped tooth from a shootout. So by the time you got to the lineup, these two women knew what kind of clothes this guy was wearing in the lineup, and one of them had a picture of him and knew the guy's name. And you're arguing that the lineup was not okay because of that. Is that correct? So we're arguing that the lineups need to be excluded because he was handcuffed without reasonable suspicion of probable cause. I think what you're looking at, Justice Kuczynski— So the fact that they put the handcuffs—I'm sorry, go ahead. But even if the lineup is excluded, they had the ashtray with the fingerprints, and the fingerprints matched the defendant, so— They didn't—so the State has conceded that they cannot show that they necessarily had his fingerprints before the arrest, which is why they've asked that if this Court doesn't bind the statements and whatnot goes in, that they remand for an attenuation hearing so they can show that the fingerprints would be an alternative way to get to this evidence. Okay. And I do think an attenuation hearing is a possibility if this Court feels like the record on attenuation in general isn't well-developed enough. Well, it's— But I— I notice that both sides agree there's a door to here. There is a door to. I just want to note that a lot of what you are noting, where it seems like the witnesses may have seen from S.F.'s son a photograph or been told what he was wearing in the lineup, all of that would cut against the idea that there was probable cause because it would indicate they were identifying because S.F.'s son, in some way, had identified him and said, this is the person that attacked you. Because, remember, before that happened, S.F. identified someone else entirely and said, you know, signed it, which the detective testified means she was 100 percent confident that's who it was. Right. And it was after her son identified someone because they had a chipped tooth from a gunshot injury and tattoos on two arms, that's how he got pulled into those photo arrays. Well, the tattoos weren't really on the arms, they were on the shoulder. That might be right, yeah. And it may or may not have made a difference, depending on what was going on during the course of this criminal activity. Right. The record doesn't indicate that the witnesses—they just said that there were the tattoos on his shoulders. Right. And that Mr. Thornton does indeed have two tattoos on his shoulders, but that's also how the detective put together the photo array that ultimately led to the 100 percent identification of someone else entirely. Right. So I think this is a perfect case. That's an example why it would have been much better to go to a neutral magistrate and present all sides of the evidence that the detective had collected and determine whether or not there was probable cause. Officer Wiggins confirmed that this is a policy of the police department. Is that correct? I don't know that he said this is a policy, but he said he doesn't do it because they use this instead. So I think it's implicit in all of the various things he said about the investigative alert system that it is a routine alternative to simply going for a warrant and that he had no intention of getting it because of the simple fact that they have this system available. They had seven days between the time of the event, the crime, and the arrest to get a warrant. Well, so they had— From the 11th to the 19th. It was on the 13th is when they got his name from the son, and on the 14th that they put together the photo arrays where DP made or SF made a tentative identification. So it was from the 14th to the 19th. So five days, four days if you consider that it was very early on the 19th, but plenty of time to request a warrant. And again, you have Wiggins testifying very clearly that this wasn't a matter of exigency or he just wasn't going to get a warrant. And I think this is a good example of the danger of not getting a warrant is that if there is not probable cause, police can't rely on a good faith exception. So it's risking losing evidence in a case just like this where you end up having a court that will hopefully look at the context of SF's tentative identification in the context of how she heard that Mr. Thornton was the assailant and the fact that she made a confident identification of a different person the day before. The officer on the street, Officer Jarvis, didn't have any of that background. What he had was an OEMC call saying, the man who's wanted for two aggravated criminal sexual assaults is sitting on this porch in a green outfit, green shorts. Correct. So he had every reason to believe there was probable cause to arrest this guy, that he had committed a crime. He found this guy sitting on the porch near that address in the green shorts. Well, so the state refers to that as though it were like a police bulletin, like what happened in USC Hensley. But again, this wasn't a police bulletin where he knew what backed that up. Even when he made the arrest, he waited until he saw there was an alert through their internal system. But we've already found that OEMC calls are generally considered reliable. And the call specifically said a man wanted for two criminal sexual assaults. So what choices would a police officer have if he's not going to go arrest this guy? I don't think the simple fact that someone is wanted coming through the OEMC system should be enough to find that that information is true and reliable. What do you think would be? I think the person needed to give, like, if the person had identified who they were, it would be easier because then they have the fear of being shown that they were out trying to harass a neighbor. But this Court has already said that, generally speaking, OEMC calls can be traced and therefore have at least an indicia of reliability. In Chicago, they can't necessarily. They offer the possibility of anonymity. It's not like in Navarrete where the California system apparently specifically traces and people should know that it's being traced when they're making the call. In Chicago, it's publicized that you don't need to be afraid to use 911 system because you can request anonymity. And here you have one coming through, the person giving no name. And again, not saying why they know this person is wanted. In Florida V. J. L. and in people V. Henderson, the important thing is not just there. You had someone saying there's someone wearing a plaid shirt at a bus station  So it was very clear about what crime was being committed, where the person was, what they were wearing. But the Court said that's not enough because we have no way for the officers to know that you're being truthful and reliable in saying that person is committed and has committed a crime. The same should be true, I think, in saying a person wearing green and white on this porch is wanted for a crime. How do you know that? Were you a witness? Have you been, do you follow the police plotter? Why do you know that this person in green and white is who you think they are and is in fact wanted for a crime? And Officer Jarvis could have gone and simply had a consensual encounter until he got his name, ran his ID, and then tried to go pick him up after that. The problem is he wanted to do a name check based on an anonymous call while someone was handcuffed in the back of a police cruiser. You don't think he could have arrested him without even doing the name check? No. Just based on the information he got from the call? So I disagree. I think under Florida v. Jail, and even under U.S. v. Hensley, there you had a police bulletin, but the court wouldn't let the police bulletin stand without showing that it had its own reasonable suspicion. We don't have that here. We still have no idea who the caller is and what they were basing this information on. It turned out to be pretty good information, though, because when they checked his DNA, when he gave a confession, when they looked at his mouth that had been shot in, when they put him in a lineup. What you're trying to convince us of, it seems to me, is that the mere act of putting the handcuffs on the defendant at the time they did it and under the circumstances that they did it, means that all of this other evidence that implicated the defendant, including his own statement where he said he did these things to these women, they all go away and he goes back for a retrial, right? So I am trying to convince this Court that you have to look at only what Officer Jarvis knew at the moment he got out of his handcuffs. I am trying to convince this Court of that. I think that's legally untenable. Well, so I think that is the Fourth Amendment jurisprudence, is that it's what the officer knew at the time. In People v. Jarrell, the person was stopped, just teary stopped, and then patted down. They found a gun, and it turns out there was an actual warrant pending for that person, but this Court recognized if the officers didn't know there was a pending warrant, then why would that matter in the Fourth Amendment calculus? It's about what the officer knows at the moment he starts impinging on someone's freedom. And then the backward calculus of what's going to happen in a retrial, what should go into it, those are questions for the attenuation analysis, not for whether or not there was a Fourth Amendment violation in the first place. Officer Jarvis stopped, cuffed, and carred a suspected violent criminal. What do you want the police to do? It's why he's suspected, and it's because an anonymous person said, that guy's one-toed, and not in person, not with his name, just a caller. Again, this is one where it's the Fourth Amendment is protecting not just particular individual defendants, the Fourth Amendment is protecting everyone in the country so that there's a correct balance between the police officers doing their very important job and people being to walk around with their full freedoms and only have those freedoms infringed when there's good reason. But here you have the family of a victim helping the police by doing some detective work on their own, and that leads to this investigative alert information that helps them get the guy who did it. Jarvis knew none of that. You just want to wipe it all out. Jarvis knew none of that, so if that's a part of the attenuation argument, that should remain in the trial court, but Jarvis knew none of that. Jarvis knew that an anonymous caller, it wasn't coming from the police officer, saying there's someone in green and white that we know our department wants. It was an anonymous caller that we know nothing about, saying someone in green and white in a particular location is wanted for a crime, and that doesn't pass the reasonable suspicion test, let alone the probable cause test to put someone in handcuffs. Wanted for a violent crime. So even if there are the, right, so even still, I think Jarvis only knowing the anonymous call certainly can't be enough to give probable cause to arrest him on the spot, because I don't think it hits reasonable suspicion to have put handcuffs on him for a Terry stop, where he had no reason to think that the call was correct. Did he have any reason to believe it wasn't correct? Does he have to view it with skepticism? He knew it came in anonymously. You know, this is, the importance here is that there has to be some reason that the police, in taking the large step in taking away someone's freedom, even as small as a Terry stop, is that there has to be a reasonable suspicion, and the courts have said reasonable suspicion means there has to be some sign that the person that told you someone broke the law has a reason for saying that, whether it's because they're an eyewitness, if it was the person's son calling, but none of that information was in Jarvis' head. All he knew was an anonymous caller said, a person in green and white is wanted, and that's not enough to put handcuffs on someone while you run a warrant check. An alternative, we have made the argument that the investigative alert here shouldn't be seen as having its own probable cause, because SF's tentative identification followed a confident identification of someone else entirely, and her identification has to be viewed in light of the fact that her son had focused on Mr. Thornton as the culprit before she made this tentative ID. And again, the question of whether there was a Fourth Amendment violation has to come before the question of what evidence goes in. That's the question of what evidence is attenuated. So, just to conclude, Mr. Thornton's arrest here occurred when he was handcuffed and taken to the back of a squad car. But even if that's viewed as a Terry stop, it was not supported by reasonable suspicion where the simple fact that an anonymous person says a particular person is wanted for crime should not be seen as reliable in and of itself because it comes through the OAMC system. This Court should not find intervening attenuation where there was no new, there was no intervening warrant and there was no new evidence, but instead the systemic use of the investigative alert system. Alternatively, this Court should find that there was not probable cause for the investigative alert in this case, but instead probable cause was only developed after the lineups that occurred after the illegal arrest. As a result, we are asking that this Court remand for a new trial without the evidence gathered after the illegal stop, or alternatively remand for an attenuation hearing where the State can make their first attempt to show how the evidence is not infected by the illegal stop and handcuffing. If there are no other questions. Thank you. I'm guessing you disagree. May it please the Court. Assistant State's Attorney Caitlin Costa for the People. Reasonableness is the touchstone of the Fourth Amendment. Everything that the officers did in this case was reasonable. The arresting officer was reasonable by approaching the defendant after the 911 call was made and asking him his name, and the detective was reasonable in amassing the probable cause and issuing the investigative alert. The 911 call said that there was a person wanted for two criminal sexual assaults sitting on the front porch of 1000 West 61st Street wearing a green and white shirt and green shorts. The State would argue that this was reasonable suspicion for the officer to approach the defendant and ask him his name. The defendant was placed in the back of the squad car in handcuffs for officer safety. He was told he was not under arrest. The encounter only lasted as long as it took the officer to run his name through the iClear system, which was only a few minutes. The door was open and the officer was sitting in the squad car with him. The officer testified several times, both at pretrial and at both pretrial hearings, that they told this defendant several times that he was not under arrest and that should his name come back clear, he would be free to go. Was he free to go while they were running the name check? Could he have just said, forget this, take these handcuffs off, I want to leave? At that point, they had reasonable suspicion to run his name. So he was detained for Terry purposes. Was he acting out? Was he threatening? Was he complaining? Was he whining? Was he yelling? No, but he was wanted for two violent criminal sexual assaults. The sexual assaults occurred over several hours. It was two victims. They were quite violent and gruesome in nature. Well, the cop didn't know that. He just knew violent crime because it's a sexual assault. Yes, that's correct, Your Honor. The officer testified in the preliminary hearing that he was handcuffed for officer safety because of the violent nature of the criminal sexual assaults, and the fact that he was handcuffed for officer safety was not challenged on appeal. The arresting officers were reasonable in relying on the 911 call because it is Chicago Police Department policy that the 911 callers will remain anonymous whenever possible. There is a CPD policy that says 911 calls will be anonymous whenever possible. People cannot make 911 calls falsely and assume that they will not be traced. If someone makes a false report, there is a way for the Chicago Police Department to backtrack that and trace those falsely. We're all getting a little dosed with F this week in an unrelated manner. Additionally, the – it was what – Excuse me. Just on that point, there's nothing in this record that says the policeman did try to track down who this anonymous caller was. The issue with the 911 call was only raised in the defendant's reply brief. We did not have a chance to argue that in our brief. The reasonableness of the officers is an objective standard, and it was reasonable for them to approach the defendant, ask him his name, and place him in the back of the car with handcuffs based on the information that they had at that time. The investigative alert was absolutely supported by probable cause. There were two victims who gave a very similar description, and that description matched the defendant, a black male between 5'7 and 5'8, 150 and 160 pounds, a cracked front tooth and tattoos on both arms. Both victims also went as far as to say that the defendant, while he was attacking them, told him – told them how he got that cracked front tooth, in that he was shot in the mouth. When the detective investigated this, he found that this defendant was the victim of an aggravated battery with a firearm where he was shot in the mouth. The – Were there any other names that popped up of people in that neighborhood or in the city of Chicago? Who had been shot in the mouth? Did anybody say? He's the only one who was ever shot in the mouth? In – within the area of that neighborhood, as you had mentioned on the direct, the – it was the son's inkling that this defendant lived in the neighborhood, and so he looked in the neighborhood to see if anyone had been shot in the mouth. I am not aware of anywhere in the record that it says otherwise. Also, the – one of the victims was able to tentatively identify the defendant from the second photo array, and all of this together was enough for the officer to – I'm sorry, the detective to issue an investigative alert. The detective did not need to get a warrant because this defendant was arrested in public. By the second lineup, SF's son had already told the police that it was this guy that did it. So when SF gave the tentative lineup of the defendant at the second photo array, she said she wasn't 100 percent sure, but we already know that the son had already told the cops that this was the guy that did it. Could one guess the son told the mom, too? That's – Your Honor, that's not in the record anywhere that I'm aware of, and the defendant did not challenge the validity of that lineup in his – I'm talking about the photo array. I'm sorry. That – the fact that he may or may not have told his mother what the name was and – or what this person looked like, that is not anywhere in the record and would need to go back for an evidentiary hearing, should that. The issue of probable cause was subject to review already by the trial court in the motion to quash. The Fourth Amendment allows for warrantless arrest in public. This arrest was in public and supported by reasonable articulation as for the Terry stop, and then once the investigative alert came back, it was – the arrest was supported by probable cause. The investigative alert that was supported by probable cause, in addition to the reasonable suspicion based on the 911 call and the name check, was good constitutional police work. What is it about the Illinois Constitution that's – in this particular case, was there a warrant? There was not a warrant. Was there an affidavit? There was not. But there was probable cause. Does the Illinois Constitution require that? So it would be the State's position that Bass was incorrectly decided on that issue, in that the Illinois Constitution is – what would be incorrect about reading the language of the statute that says, no warrant shall issue without, one, probable cause, and two, supported by an affidavit? Here we have no warrant and no affidavit. This arrest was in public, and you do not need a warrant to arrest someone in public. If you see someone committing a crime, obviously, cops have to have that right. And if you learn if some witness says, there's the guy, that guy running in the red shirt, he's the one who just robbed me, obviously, that's a good reason to do it without a warrant. And what you want us to believe is that an investigative alert instead of a warrant is okay. Our position would be that it was a Terry stop until the name check came back and the investigative alert said that there was probable cause to arrest this individual Once that investigative alert came up, then the arresting officers had probable cause. Do you think the officer had probable cause to arrest this guy before he checked the name check? He had reasonable suspicion to approach him and ask him for his name, which is exactly what they did. To receive a 911 call about a wanted criminal sexual predator and not approach them or not ask questions of this person would not be due diligence in police work. The investigative alert that was supported by probable cause, in addition to a reasonable articulable suspicion supported by the 911 call, in addition to the name check, was good constitutional police work. If this Court should find that the arrest was not supported by reasonable articulable suspicion, the State would argue that the probable cause existed before the arrest. So once the officers knew of the investigative alert, they would have to release defendant only to arrest him a block away because they now knew about the investigative alert. This defendant had a previous criminal record? I'm not sure. He was in the system? I'm not sure. Was your colleague shaking his head? No. Yes. So it would have taken Detective Wiggins about, what, five minutes, once he had the ashtray and the fingerprints, to find out the son's saying it's this guy. I've got this ashtray with fingerprints on it. This guy might be in the system. Let me find out if this guy's in the system. Oh, now I've got plenty to go to a judge for a warrant. And judges there, 406 judges in Cook County that live all over the place, pretty much available 24-7 somewhere? From the record that I had, it was not clear whether and at what time the defendant was fingerprinted, so we would ask that that issue go back to the trial court for an attenuation hearing on the fingerprints and the inevitable discovery argument. If this court should find that the arrest was not supported by reasonable or articulable suspicion nor probable cause, the in-person lineup where both victims identified the defendant should serve as intervening probable cause. Everything after the lineup should be considered attenuated and should go back to the trial court for an attenuation hearing. Additionally, the defendant abandoned his argument about his motion to quash the statement in his appeal. There was nothing in the appeal about the statement. We would ask that you uphold the defendant's conviction and deny his appeal. If there are no further questions. Rebuttal. So I'd like to start by clarifying a couple things. The defendant, throughout the appeal, has been trying to get the statement that was used against him at trial suppressed. So that's still a part of the appeal and was in the original pro se motion and kept throughout the motions to reconsider. The state also suggests that we've conceded that Mr. Thornton was handcuffed for officer safety on appeal. We're not concerned with Officer Jarvis' subjective belief on why he wanted to handcuff. We're concerned with whether or not it was reasonable to handcuff at that moment, and that is something that has been raised in the motion to reconsider by the public defender and on appeal that the handcuffing was unreasonable and created a Fourth Amendment violation, whether viewed as an arrest or a Terry stop. We'll consider that. And then also this idea that the 911 call wasn't raised in the opening brief. The 911 call and the 911 call system in Illinois became relevant because the state suggested that the simple fact that the call came in through the OAMC system made it somehow specially reliable because of the Navarrette case in California. So once that becomes important, then it becomes important why in Navarrette what the court was relying on and saying that the fact that it was a 911 call mattered, and there the court went to a lot of detail about how the 911 calls are traced in California, and that alone wasn't enough. It was also the fact that the person reporting an incident was an actual eyewitness and that it was nearly contemporaneous with the reckless driving she had witnessed, so she was still under the excitement of having seen it. That's not true here where you have the incident occurring on the 11th, and then you have this call coming in on the 19th. Okay. And we don't have very much detail about the OAMC call, so the state could have provided it if they chose not to at the trial court, but our colleagues in the Fourth District in Eilers said a tip on a police line is usually reliable. They said, okay, you can use it. Now, we don't know what the differences are between the system in Quincy and the system in Chicago, so it may be that at the very least you have to find out what are the differences. I'm concerned that the police didn't try to track this guy down. I'm also concerned that we have a confession here. Nobody is arguing that the confession was forced or coerced. No one is saying that. We have a confession. So you are arguing that we should ignore the confession because the police officer, who had a reasonable belief that this person was wanted for a violent crime and arrested him, the arrest wasn't any good. So the confession occurred after the arrest. I understand that. And, you know, Brown v. Illinois and... But in the trial, the defense didn't raise any issues about the OAMC call either, about the process of Chicago, did they? The defense did raise that when he was handcuffed, it was based solely on this phone call. Did you go into any detail about the process for OAMC? Did you get an expert witness from OAMC? No, because the burden is on the state to show why the officer was correct in relying on an anonymous tip. And here, the defense theory below, and now on appeal, is simply that an anonymous tip over the OAMC call that someone is wanted for a crime is not enough. So if the state wants to give some reason why the citizen... Because, again, it's not just that it's traceable. So what are the police supposed to do? Just roll the window down and say, what's your name? Are you wanted for a couple rapes? That would be appropriate. Roll your window down, what's your name? And then they can check. And if there's a warrant that has been issued, they can arrest him based on the warrant. I wouldn't want to run a sang in the street if that's what the police were allowed to do. Nor would I. You could wait and see if Mr. Thornton... You know, we have all these cases... So once someone does that, what stops Mr. Thornton from then running over to Indiana or Canada? He didn't run. That's exactly where the cases say. If someone runs off from the police, that raises the suspicion level. But you don't have that in this case. The reasonable suspicion depends on what the person's doing and what the police officers know in that moment. Here he's not running. You just have an anonymous person saying that. The police roll down the window and say, excuse me, sir, are you the guy that's wanted on these two criminal sexual assault cases, these two rapes? And the guy says, heck no, I'm not. And then he goes home, packs a bag, and quietly disappears into the night. That's a good solution for the citizens of the city? The good solution for the citizens of the city is they ask Mr. Thornton his name, he gave it, and then they look and see if there's a pending warrant. If they had looked, they would have seen there is no warrant. I agree on the warrant part. I was on the BAS panel, and I agree on the warrant part, investigative alerts. You had five days to get a warrant. So that part, you and I are on the same page. The whole rest of it, whether or not the absence of a warrant, given what the officer knew at the moment that he arrested this man, I believe it was an arrest, and I believe that that's the question is whether or not when he arrested this man he had enough to make it a good arrest. And that's where you and I are probably sort of locking horns. Right, and I think here you particularly, if we look at the close, it's not just that the defendant was not fleeing in that moment. He was cooperative. He gave his name. He was on foot. There were two police officers. They had a car. There was no reason to think they couldn't go look in their system before they go put handcuffs on him. They did this because it was convenient, and that's a part of what's so offensive to the Fourth Amendment, is there was no sign that there was some sort of exigency here where they needed to stop him from running, because if there was any sign of that, then the Terry stop information and the probable cause cases all make it flexible enough so the police can act when there are signs that they need to, but they just didn't wait to develop those actions. And there's a strong chance that had – I shouldn't say there's a strong chance. We don't know what would have happened because the case went the way the case went. But they asked in a consensual encounter for his name, and he gave it to them and made no signs that he was running. So there was no need for convenience for the Fourth Amendment to say, well, then you can go ahead and put him in handcuffs and take him where you want, and then you can check. You have to get the reasonable suspicion first. You have to get probable cause before you truly arrest someone. And I think that's because you have to find that right balance between what the Fourth Amendment allows and what police officers are allowed to do. And I think the standards we have allow that, but this is a case where the officers were too interested in convenience to understand the importance of those Fourth Amendment standards. Well, it wasn't Officer Jarvis. It was Detective Wiggins. Well, in Officer Jarvis, I think – It was also the police department's policy to just skip warrants altogether and do investigative alerts. Right, right. So Officer Jarvis was just relying on what his police department provided him. Well, so that's where I think where Officer Jarvis went to using the handcuffs, he too was relying on convenience and wanting to just handcuff the person and go ahead and get him in the car already before he checked to see if there was any alert on this person's name, let alone a warrant on their name. So I think what you're arguing, if I'm hearing this correctly, is that you object to the fact that they had no knowledge of the investigative alert before they handcuffed the suspect, not to the investigative alert necessarily. Right. So we are objecting to the use of the investigative alert system, but only in the – I mean, primarily in the attenuation analysis because in our mind the Fourth Amendment violation happened based on what Jarvis knew when Jarvis used the handcuffs and his partner because, again, the defendant was outnumbered as well as showing no signs of fleeing or pulling a weapon or anything of that nature. I also want to note, I think Justice Kuczynski, you were asking if he was the only person in the neighborhood with the chipped tooth and the tattooed shoulders. They obviously ran some sort of database about who got shot in the mouth, and I didn't see anything in the record about any other people being pulled up in that search. I think they may have – it seemed to me that Detective Wiggins looked for a name to see if that guy had ever been shot in the mouth. Right. Instead of looking to see in the universe who has been shot in the mouth which resulted in not being dead but having chipped teeth. And it just occurred to me that that was sort of an odd way to go about it, relying only on the son's information. Right. The son is conducting his own investigation out there. He knows the neighborhood. He knows the people in the neighborhood. He asks around. He finds out, hey, did anyone ever have a chipped tooth being shot in the mouth? Gives the name to the detective. Then we don't know for a fact that he gave the name to his own mom, but we do know that by the time the lineup occurred, the other woman who was involved in this horrible crime not only had a picture of this defendant but also this defendant's name and knew what he was going to wear in the lineup. So you have a lot of problems with this case, but you also have this strong confession, and you also have the fact that this officer was relying on an OEMC call that nobody has disproved was reliable. Nobody has proved that it was. Nobody has said that it wasn't. We don't know. So a couple of things. First, you're correct that it was SF's son identifying Thornton as someone who had a chipped tooth due to a gunshot. That's why that was what was checked. There is no information on how many people have chipped teeth and have been shot in the mouth in this neighborhood and have tattoos on their shoulders. So to pretend as though that's enough of a pretentious ID to make this into probable cause I think is questionable. And then to this idea of the statement that comes out and the fact that it's not being contested as involuntary, the courts have been really clear that the attenuation analysis, so whether a statement should be suppressed because it comes after a Fourth Amendment violation, is different from the voluntary, the Fifth Amendment voluntary analysis. Right. So he's not seeking to have it suppressed as involuntary, but instead saying that it's tainted by the fact that he was handcuffed based on an anonymous phone call and et cetera, et cetera. And then to the idea that no one has proven whether or not the OAMC system is reliable, I just want to clarify that Navarette, the issue wasn't whether or not the, first of all, the case didn't hinge entirely on the fact that the call came in through the 911 system. And then the issue wasn't whether or not the 911 system was reliable. It was that a caller would expect that a call into the 911 system would be traceable, so they wouldn't want to do something shady over that system. Here, the same can't be true where it's specifically created so that you can make anonymous calls in Chicago. So I think there's a difference there where it's about what do the people using the system know about it and can you assume that they are afraid to use it for something if they're not sure about their facts. And another thing. When you call 911, does the operator say this call can be anonymous? I don't have the answer to that. So this is the other point I wanted to make. Again, it is my last point. The 911 system and whether or not the 911 call was reliable, that was extra information the state could have used to say why they had a reason to be handcuffing, not for the defense to use. The defense simply said this was an anonymous call. So as the record stands now, this court knows that there was an anonymous call through the OAMC system. I think this court should find that this is an important case where there is the opportunity to say you can't arrest someone just for a name check and you shouldn't use an investigative alert if you don't want to get into an attenuation hearing. If there are no further questions. Thank you. Thanks again for the briefs and the argument. Well done by both sides, as usual. We appreciate your work. And we'll get back to you with an opinion. We're adjourned.